UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GREGORY O'BRIEN, on behalf of himself and others
similarly situated,

Plaintiff,

v.

ARGO PARTNERS, INC., a/k/a ARGO PARTNERS,

Defendant.

09 Civ. 1020 (LDW) (AKT)

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ARGO PARTNERS, INC., MOTION FOR SUMMARY JUDGMENT

### ORAL ARGUMENT TO BE REQUESTED BY SEPARATE LETTER PURSUANT TO PART RULE 2(F)

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...................................................................................1

II. SUMMARY OF FACTS ........................................................................................4

    A. O'Brien's Insurance Settlement .....................................................................4

    B. The Ambassador Liquidation and O'Brien's "Allowed Claim" ......................5

    C. Argo Purchases O'Brien's "Approved and Recommended Claim" ................7

III. STANDARD OF REVIEW ................................................................................15

IV. ARGUMENT ....................................................................................................16

    A. The Contract was for the assignment of "all right, title and interest in and to the allowed and recommended claim," in the sum-certain amount of $1,000,000., and did not include a separate right to accrued interest ..................................................16

        *1.* The core term of the contract, "allowed and recommended claim," is objectively ambiguous ...............................................................................17

        2. Because the contract terms at issue are ambiguous, the Court must look to extrinsic evidence...................................................................................21

    B. O'Brien's Fraud Claim Prevails........................................................................24

    C. New York State's "Structured Settlement Act" Applies..................................27

V. CONCLUSION ...................................................................................................28

ii

# TABLE OF AUTHORITIES

**Cases**

*American Home Prods. Corp. v. CAMBR Co.*, 2001 U.S. Dist. LEXIS 716
(S.D.N.Y. Jan. 29, 2001)..................................................................20

*Beltrone Constr. Co. v. State of New York*, 189 A.D.2d 963,
592 N.Y.S.2d 832 (3d Dept 1993)...................................................17

*Breslin Realty Dev. Corp. v. Schackner*, 457 F. Supp. 2d 132 (E.D.N.Y. 2006)....................15

*Buxton Mfg. Co. v. Valiant Moving & Storage*, 239 A.D.2d. 452
(N.Y. App. Div. 2d Dep't 1997)........................................................25

*Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147 (2d Cir. N.Y. 1990)................17

*Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund,
Legal Servs. Fund & Annuity Fund v. Lollo*, 148 F.3d 194 (2d Cir. N.Y. 1998)...........25

*Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 498 N.Y.S.2d 344 (1986)..................................17

*City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. N.Y. 2008)...........25

*Crowley v. Chait*, 2006 U.S. Dist. LEXIS 8828 (D.N.J. Mar. 7, 2006)...............................6

*In re United States Brass Corp.*, 277 B.R. 326, 332 (Bankr. E.D. Tex. 2002).......................19

*In re Pharm. Indus. Average Wholesale Price Litig.*, 2007
U.S. Dist. LEXIS 26242, 119-120 (D. Mass. Apr. 2, 2007)................................25

*In the Matter of Ambassador Insurance Company*, Docket Number S-443-83 (Vt. Super. Ct.
March 10, 1987).............................................................................5

*Matter of 321 Henderson Receivables, L.P. v. Martinez*, 2006 NY Slip Op 26054, 2
(N.Y. Sup. Ct. 2006).....................................................................27

*O'Brien v. Brookhaven Memorial Hospital, et al.,* Index Number 4401-82,
(Sup. Ct. Suffolk County)................................................................4

*Portuguese-American Bank v. Welles*, 242 U.S. 7 (1916)..............................................1

*Ruffing v. Union Carbide Corp.*, 308 A.D.2d 526, 528 (N.Y. App. Div. 2d Dep't 2003)..........25

*Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,*
7 F.3d 1091, (2d Cir. 1993)...............................................................17

*Siotkas v. Labone, Inc.*, 594 F. Supp. 2d 259 (E.D.N.Y. 2009)..........................................25

*Sprint Communs. Co., L.P. v. APCC Servs.*, 128 S. Ct. 2531, 2536 (U.S. 2008)....................16

*Thabault v. Chait*, 541 F.3d 512 (3d Cir. 2008)..................................................................6

*United States ex rel. AWL Indus. v. Site Remediation Servs. Corp.*, 92 F. Supp. 2d 132
    (E.D.N.Y. 2000).....................................................................................15, 17, 20

*Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 832 (9th Cir. Cal. 1996)..........................19, 20

**Statutes**

NY CLS Ins § 7602.....................................................................................................18

N.Y. Gen. Oblig. Law § 13-109.....................................................................................19

New York State Structured Settlement Protection Act,,
    NY Gen Oblig. Law § 5-1701..................................................................................27

**Rules**

Fed. R. Civ. P. 56(c).................................................................................................15

Plaintiff Gregory O'Brien respectfully submits this Opposition to the motion of Defendant Argo Partners, Inc. for summary judgment.[1]

## I. PRELIMINARY STATEMENT

> When a man sells a horse, what he does, from the point of view of the law, is to transfer a right, and a right being regarded by the law as a thing, even though a *res incorporalis*, it is not illogical to apply the same rule to a debt that would be applied to a horse.

*Portuguese-American Bank v. Welles*, 242 U.S. 7, 11 (1916) (Holmes, J.)

Gregory O'Brien ("O'Brien") was paralyzed in an automobile accident thirty years ago. A lawsuit stemming from the accident resulted in a $1 million settlement with Ambassador Insurance Company ("Ambassador"), which was then in bankruptcy. From 1989 to 1999, O'Brien received payments totaling $900,000 from Ambassador. In 2006, Argo Partners Inc., ("Argo") which is in the business of buying claims against bankrupt companies, bought the $100,000 balance of O'Brien's allowed claim for 6.25 cents on the dollar (against the $1,000,000 settlement), or $62,500. It turned out to be worth the full $100,000, yielding a substantial profit to Argo. Seeking a windfall, Argo now claims to have purchased something else, for Argo soon realized that in addition to the "allowed and recommended claim" there was accumulated interest, valued at more than $500,000. However, Argo had negotiated only for the limited "allowed and recommended claim," and using a boilerplate contract of its own creation, memorialized that transaction.

Justice Holmes, writing almost a century ago, captured the essence of the case now before this Court: Just as people can contract for the sale of physical things, so too can they sell

---

[1] This case has been brought as a class action on behalf of O'Brien and a class of similarly situated plaintiffs. Magistrate Judge Tomlinson has directed that this matter proceed first with respect to O'Brien, and discovery thus far has been limited. Nevertheless, it appears that the documents at issue in O'Brien's transaction are similar or identical to those used with the members of the class, who number circa 170.

intangible things, and the basic rules applied to the sale of physical objects apply to "*res incorporalis*." This case is about determining what was the "thing" (the "horse" in this case) that O'Brien sold to Argo. But, unlike the word "horse," whose plain meaning is commonly and almost unambiguously understood, "allowed and recommended claim" had a special meaning to the parties to this contract. Absent that context, it is inherently ambiguous. Accordingly, this case turns on the meaning of those words in Argo's contract defining what Argo acquired from O'Brien as the "right, title and interest in and to the allowed and recommended claim or claims of [O'Brien]... ('the Claim')... against Ambassador Insurance."

Argo found that the horse it purchased was harnessed to a golden carriage, and badly wishes that "horse" meant "horse and carriage." Consequently, Defendant wishes to unilaterally rewrite its own contract to encompass not only O'Brien's "allowed claim" but also the accrued interest on O'Brien's original claim. For the price of a "horse" ($62,500.00), Defendant wishes us to believe that it purchased a "horse and carriage" valued at more than $600,000.00.

Defendant's entire argument boils down to insisting that the words of the contract, "allowed and recommended claim," actually and unambiguously mean something else. But emphatic repetition does not make it so. The words of the contract strongly support the conclusion that O'Brien sold only the balance of a defined thing, "the allowed and recommended claim," and thus never sold the right to the interest which had accrued on his original claim. Further, the record is replete with evidence, direct, indirect and inferential – ultimately for evaluation by a jury as to credibility and the strength of inference that may be drawn – that the parties intended the words to have that limited meaning:

- O'Brien testified at deposition and alleged in his *Amended Complaint* ("*Am'd Cplt.*") that "allowed and recommended claim" meant a finite sum of money: $1,000,000.

2

- O'Brien's attorney, who negotiated the claim on his behalf, an expert with over 50 years of experience as a lawyer handling such matters, agreed and testified that "allowed and recommended claim" meant a finite sum of money.

- The governing *Liquidation Order*, issued by a Vermont Superior Court, defined "allowed" or "approved" claim as a finite sum of money, and explicitly distinguished it from any interest that may accrue.

- Without exception, the documents by which Argo sought to purchase O'Brien's claim – all of which were drafted by Defendant Argo – use the term "allowed claim" as a sum-certain, and all describe Argo's offer in terms of "cents on the dollar," appropriate to transactions involving such sums.

- Discovery has yielded no evidence, documentary or otherwise, showing that either party made any effort to assess the present value of anything except that finite sum.

- When asked under oath at his deposition, to define "allowed claim," Argo President Michael Singer said, "What it ["allowed claim"] generally means to me is that the principal amount of the claim that was allowed by the receiver as a basis for paying people." Singer Dep. 40, Declaration of Steven A. Cash, dated April 17, 2010 ("Cash Decl."), Ex. 34 (emphasis added).[2]

- And, finally, discovery has revealed instances involving other bankruptcies in which Argo did, in fact, seek to acquire accrued interest on claims, and explicitly and unambiguously so provided in the documents which it drafted. It did not do so here. Cash Decl., Ex. 23-26.

On the other hand, Argo now argues, with little evidence, that its employees understood "allowed claim" to include accrued interest on the underlying claim, in addition to the principal amount of the "allowed claim." But Argo makes no substantive argument that those words have that "unambiguous" objective meaning, and they are left with offering **extrinsic** evidence, scant as it is, of what Argo employees say they subjectively believe the words meant. The result is a classic question of fact: Whose account is credible?

---

[2] Only after his attorney interposed an objection did Singer change his testimony, and contradicting his earlier clear description, began to insist on a broader meaning of the words "approved claim." Singer Dep. 41, Cash Decl., Ex. 34

## II. SUMMARY OF FACTS[3]

### A.  O'Brien's Insurance Settlement

On March 5, 1980, O'Brien, a 27 year old Suffolk County police officer, completed a

shift at his second job as a school security officer and began driving home.  He was struck from

behind by another automobile while stopped at a traffic light.  Unconscious and badly injured,

O'Brien was rushed to Brookhaven Hospital.  At the hospital, O'Brien was improperly moved by

hospital personnel, paralyzing him from the neck downwards.  He has been confined to a

wheelchair ever since. *Am'd Cplt.* ¶¶ 40-41; O'Brien Dep. 12-13, Cash Decl., Ex. 30.

Represented by attorney Norman Dachs, ("Dachs") O'Brien commenced a lawsuit

against Brookhaven Hospital and associated medical personnel.[4]  That case resulted in a

settlement under which Brookhaven's insurer, Ambassador, which was in receivership, agreed to

pay O'Brien $1,000,000.[5]  *Am'd Cplt.* ¶¶ 42-46; *Stipulation of Settlement* p. 4, ("*Stipulation*"),

Cash Decl., Ex. 7.  The settlement referenced the ongoing Ambassador liquidation: "It is

understood by the parties that the Ambassador Insurance Company, which is in receivership, will

be making payments at the end of the liquidation which is presently pending." *Stipulation*, p. 4,

Cash Decl., Ex. 7. The settlement also included an arrangement for recurring payments to satisfy

O'Brien's tort claims, including a flexible schedule linked to the ability of the insolvent

Ambassador to pay. *Id.; Am'd Cplt.* ¶¶ 44-45; Dachs Dep. 17-18, Cash Decl., 31.

---

[3] This statement of facts is based on and supported by the Cash Decl. and the Exhibits attached thereto and the *Amended Complaint* filed Sept. 28, 2010.

[4] Dachs represented O'Brien in the negotiations with Argo that are the focus of this lawsuit and in the filing of the instant lawsuit.  By order of April 5, 2009, Magistrate Judge A. Kathleen Tomlinson granted O'Brien's motion to substitute present counsel for Dachs.

[5] *O'Brien v. Brookhaven Memorial Hospital, et al.,* Index Number 4401-82, (Sup. Ct. Suffolk County)

B.      The Ambassador Liquidation and O'Brien's "Allowed Claim"

In 1983 Ambassador was placed in receivership through an action brought by the

Vermont Insurance Division ("Insurance Division") in Vermont Superior Court.[6] In 1984 the

Vermont court appointed the Insurance Division as the receiver and liquidator ("Liquidator") for

the bankrupt company and proposed a comprehensive order governing the liquidation of

Ambassador. *Am'd Cplt.* ¶¶ 31-32. In 1987 the Vermont Superior Court approved that proposed

order. *Am'd Cplt.* ¶¶ 31-32; *Liquidation Order, In the Matter of Ambassador Insurance*

*Company* ("*Liquidation Order*"), Cash Decl., Ex. 3. The *Liquidation Order* required that "any

person seeking to receive distributions in liquidations as a claimant file with the Liquidator a

claim." *Liquidation Order* ¶ 14(a). The Liquidator was directed to evaluate those claims and to

report to the court the "name and address of each claimant and the amount of the claim finally

recommended." *Id.* ¶ 20(b). Unless disapproved by the court within 60 days of the Liquidator's

submission, "[s]uch claims… shall be deemed finally approved by the court and shall constitute

**allowed claims.**" *Id.* ¶ 20(d) (emphasis added); *Am'd Cplt.* ¶ 33.

In addition to providing for payment of the "allowed claims" (also referred to as

"approved claims"), the *Liquidation Order*, in a separate paragraph, provided for the possibility

of interest payments. *Liquidation Order* ¶ 21(e), Cash Decl., Ex. 3; *Am'd Cplt.* ¶ 34:

> To the extent funds are available, the Liquidator shall pay interest
> on the unpaid portion of any allowed claim, with such interest to
> accrue as of the date of the first partial payment made on that
> claim. No interest shall be payable unless and until the principal
> amount of all **allowed claims** of the same priority have been paid
> in full . . .

---

[6] *In the Matter of Ambassador Insurance Company*, Docket Number S-443-83 (Vt. Super. Ct.
March 10, 1987).

5

The Liquidator also filed a lawsuit on behalf of Ambassador against Ambassador's auditors, Coopers Lybrand (now PricewaterhouseCoopers) and Arnold Chait, former Ambassador President. *Am'd Cplt.* ¶¶ 36-37; *Crowley v. Chait*, 2006 U.S. Dist. LEXIS 8828 (D.N.J. Mar. 7, 2006). The litigation lasted more than twenty years in New Jersey federal court and culminated in a jury verdict in July 2005 against defendants in the amount of $182.9 million including pre-judgment interest. *Am'd Cplt.* ¶¶ 36-37.[7]

Along with the 1987 *Liquidation Order*, the Vermont Superior Court issued a *Notice of Liquidation* advising potential claimants, including O'Brien, of the procedures contained in the *Liquidation Order* and the requirement and procedures to file a claim. *Notice of Liquidation*, Cash Decl., Ex. 4; *Am'd Cplt.* ¶ 35. On October 30, 1987, Dachs, on behalf of O'Brien, filed a claim with the Liquidator in the amount of $1,000,000 in accordance with the *Stipulation*. *Claim Number 04120*, Cash Decl., Ex. 8; *Am'd Cplt.* ¶ 47. The Liquidator subsequently advised O'Brien that his "claim had been reviewed and will be recommended to the Court for approval in the amount of $1,000,000." *Notice of Approval of Claim of Gregory O'Brien*, Cash Decl., Ex. 9; *Am'd Cplt.* ¶ 48. After 60 days elapsed without court action on O'Brien's recommended claim, the recommended claim was deemed to **constitute an allowed claim.** *Am'd Cplt.* ¶ 49

By check dated June 9, 1989, the Liquidator paid O'Brien $200,000.00, the first payment on the "allowed claim." The Liquidator wrote in an accompanying letter, "WE ARE PLEASED TO ENCLOSE A CHECK IN THE AMOUNT OF $200,000.00, WHICH REPRESENTS THE COURT APPROVED DISTRIBUTION OF 20% OF YOUR **APPROVED CLAIM** OF $1,000,000.00 … [D]EPENDING ON THE ASSETS OF THE ESTATE THERE MAY OR MAY NOT BE A FUTURE DISTRIBUTION ON YOUR CLAIM." *Claim Payments and*

---

[7] Coopers Lybrand appealed and the judgment was upheld. *Thabault v. Chait*, 541 F.3d 512 (3d Cir. 2008).

*Checks*, Cash Decl., Ex. 10 (emphasis added); *Am'd Cplt.* ¶ 50. The Liquidator made four more

payments, the last on December 29, 1999. Each payment was accompanied by a communication

from the Liquidator containing the same language as the June 1989 letter regarding possible

future distributions. The five payments totaled $900,000.00, or 90% of the "approved claim."

*Claim Payments and Checks*, Cash Decl., Ex. 10.; *Am'd Cplt.* ¶ 51.

Accordingly, as of December 29, 1999, O'Brien owned **two** things related to the

Ambassador liquidation. First, he owned the balance of his "allowed claim," $100,000.

Second, he owned the possibility of a further distribution of interest accruing on his original

claim. *Am'd Cplt.* ¶ 52.

Subsequent to the 1999 payment, Dachs would periodically write the Liquidator seeking

an update, and the Liquidator would return Dachs' letter with a handwritten notation indicating

the status. No reference was ever made by the Liquidator to the possibility of payments, such as

accrued interest, in addition to the "allowed claim," and the convention of using a percentage of

the "allowed claim" to describe the status was often used. *Letters from Dachs to Ambassador*,

Cash Decl., Ex. 11; Dachs Dep. 24-28, Cash Decl., Ex. 31; *Am'd Cplt.* ¶ 54.

On August 31, 2006, J. Claude Isabelle ("Isabelle") responded on behalf of the Liquidator

to an August 22, 2006 letter from Dachs seeking an update. Isabelle advised Dachs that

"Ambassador recently won a jury award against their accounting firm… [and that] the

accounting firm has filed an appeal." Isabelle included a copy of a news article discussing the

lawsuit. *Letter from Isabelle to Dachs*, Cash Decl., Ex. 12; *Am'd Cplt.* ¶ 54.

C.     **Argo Purchases O'Brien's "Approved and Recommended Claim"**

Argo is a New York-based company that specializes in purchasing the claims of

distressed companies. The Argo business model is simple and efficient. Argo first identifies

7

"bankrupt and distressed companies," largely through the review of publicly available databases. Singer Dep. 22-23, Cash Decl., Ex. 34. With only a handful of employees, this duty is generally the responsibility of Argo President, Michael Singer ("Singer"). *Id.* 23. Once a target is identified, an Argo analyst assesses the potential value and presents the findings informally to Singer. *Id.* 24. The key findings regarding the target are "size, value, and whether there is really going to be any value here, whether there are any overriding considerations." *Id.* 25. The outcome of this process is an assessment of "value," expressed in "dollar, macro dollar terms." *Id.* 26-27. That value is then allocated across the various classes of creditors to the bankrupt or distressed company. *Id.* Based on the value determination and the creditor allocation, Singer decides whether the target company is a viable subject for investigation. If so, the analyst creates a file. Within Argo, the matter is termed a "case." Puccio Dep. 8, Cash Decl., Ex. 32; Singer Dep. 32-33, Cash Decl., Ex. 34.

The analyst then follows the case, and, at some point, recommends whether to formulate a bid to purchase the claims of individual creditors. According to Singer's testimony, such bids, generally, are formulated in terms of "X cents on the dollar" of the creditor's claim. In the words of Singer: "[I]f we think trade claims could eventually get X cents on the dollar, depending on how long, the risk, you know, whatever, and that's not an exact science, we will say 'We are prepared to pay a discount from X today to buy that claim. Mr. Claimant, are you interested[?]' That's it." Singer Dep. 34-36, Cash Decl., Ex. 34.

It was this process that Argo applied to the Ambassador bankruptcy. In 1994, Argo acquired a "box" containing a list of the "allowed claimants" in the Ambassador liquidation. The original Argo analyst, David Fishel, "looked up the number of the claimants... after we had a conversation on how much we would bid, and he started to call those claimants and bid them."

Singer Dep. 38-42, Cash Decl., Ex. 34.  Singer's deposition testimony clearly states that those

bids were for the **principal** amount of the "allowed claim":

> Q:   **You used the term '"allowed claim"' before. What did you mean by that?**
>
> A:   **What it generally means to me is that the principal amount of the claim that was allowed by the receiver as a basis for paying people.**
>
> Q.   So in this particular case, back in '94 you determined to bid some amount for the "allowed claim", which described as the principal amount that the receiver had determined to allow to each claimant, is that correct?
>
> A.   I'm not sure I got all the elements of your question.  But it has been the same all the way along.
>
> Q.   The "allowed claim" is the principal amount?
>
> A.   Correct.
>
> Q.   And you bid some amount in order to purchase that from people?
>
> A.   Correct.
>
> Q.   And how is that bid expressed?
>
> A.   As a percentage of the amount?
>
> Q.   **Can you describe how you communicate that bid to a potential seller of the "allowed claim"?**
>
> A.   **Well, typically if they have a claim of 100, that's the principal amount of their claim, on which everything else is based, we will say to them you have already received, in this case, for example, let's say 75 cents on the dollar.  We are prepared to pay you another 5 cents or 7 cents or 8 cents on the amount of your claim.[8]**

*Id.* 40-41 (emphasis added).

Joseph N. Puccio ("Puccio"), a former Argo analyst, testified similarly.  In response to a

question about the meaning of "allowed claim," Puccio responded: "Just like it says, that Argo

---

[8] After his attorney interposed an objection, Singer changed his testimony, and offered a different meaning of the words "approved claim," as including "everything": "[t]his is real standard procedure in our business, not just insurance companies, bankruptcies, etc., standard procedure." Singer Dep. 42, Cash Decl., Ex. 34.  In so doing, Singer created an issue of fact and credibility within his own contradictory testimony.  Singer himself could recall only a few times in Argo's history where the transaction involved eventual payment in excess of the "allowed amount." *Id.* at 77-78.

would be interested in purchasing 'allowed claims, not contested claims.'"  Asked what was the

basis underlying Argo's bid for "allowed claims, he responded, "**It is a percentage of the**

**amount of the allowed claim. Interest has no relevance to it.**"  Puccio Dep. 109 – 110, Cash

Decl., Ex. 32. (emphasis added).

It was Puccio, then still an Argo employee, who sent a form letter in September 2006 to

O'Brien, in care of Dachs, seeking to purchase O'Brien's approved claim.  Cash Decl., Ex. 13.

Puccio wrote that Argo had learned of O'Brien's approved claim against Ambassador which:

> appears to have been approved for allowance in the amount of
> $1,000,000.00... [and] that since the liquidation you and/or your
> organization should have received distributions totaling 90%...  [The letter
> continued that Argo was] currently bidding on the **allowed claims** and [is]
> prepared to make an offer of an additional 5 cents on the dollar, which
> translates into a payment of $50,000.00, bringing your total recovery to
> 95%.

Cash Decl., Ex. 13 (emphasis added); Dachs Dep. 30-31, Cash Decl., Ex. 31; *Am'd Cplt.* ¶¶ 55-

56. The letter enclosed a form purchase agreement and assignment of claim.  It made no mention

of any offer to purchase anything except the balance of the "allowed claim" of $1,000,000.  Cash

Decl., Ex. 1.  The proposed purchase agreement described the thing which Argo sought to

purchase as "all of Assignor's right, title and interest in and to the allowed and recommended

claim or claims of Assignor ('the Claim') against Ambassador Insurance Company... in the

current outstanding amount of $1,000,000.00."  The proposed assignment of claim had similar

language, although it added the words "as more specifically set forth" before the parenthetical

enclosing the words "the Claim." Cash Decl., Ex. 2.

None of the proposal documents stated, or even implied, that Argo sought to purchase

anything except the "allowed and recommended claim," a term left undefined. No mention was

made of the possibility that accrued interest payments might become available from Ambassador's Liquidator, and the phrasing of the offer, including the statement that this would result in a "95%" recovery is inconsistent with anything but a sum-certain purchase. Most importantly, Argo's offer did not include any indication that it wished to purchase the rights to such interest payments. Cash Decl., Ex. 13.

During the next weeks, Dachs, on behalf of O'Brien, negotiated with Argo regarding a purchase price for O'Brien's "allowed claim," focusing on the "cents on the dollar," the term used to quantify the purchase price, referring always to the balance of the "allowed claim." *Am'd Cplt.* ¶ 58; Dachs Dep. 43, Cash Decl., Ex. 31. Not surprisingly, Dachs made no effort to assess the potential present value of accrued interest on the underlying claim because he was negotiating only for the sum-certain balance of the "allowed and recommended claim." *Am'd Cplt.* ¶ 58; Dachs Dep. 57-58, Cash Decl., Ex. 31 ("by its terms it [the offer] does not include interest, it speaks only of the allowed and recommended claim. The allowed and recommended claim, as you'll note from the claim, is the $1 million that was allowed and recommended, so it doesn't speak of interest..."). That Argo employees shared Dachs' view is strongly supported by the fact that there is no evidence that they made any effort to assess the value of the interest either, nor do any of the Argo records provided in the course of discovery even mention or discuss the possibility. Indeed, Argo thoroughly searched its company records, electronic files and emails, but produced no evidence that it contemplated or intended the purchase of any accrued interest on O'Brien's "approved claim." *See, e.g., Declaration of Kenneth De Koven,* Cash Decl., Ex. 28.

Eventually, Argo and O'Brien executed two documents: a Purchase Agreement and an Assignment of Claim.[9] Together, those two documents represent an agreement for the sale by O'Brien of "all right, title and interest" of his "allowed claim" for $62,500. *Am'd Cplt.* ¶¶ 59-65; Cash Decl., Ex. 1-2. The operative paragraph in the *Purchase Agreement* reads as follows:

> O'brien, Gregory... ("Assignor") in consideration of the sum of $62,500.00 does hereby assign to Argo Partners ("Assignee"), all of Assignors right, title and interest in and to the allowed and recommended claim or claims of Assignor ("the Claim") against Ambassador Insurance Company (the "Estate") in liquidation proceedings in the Superior Court of Vermont, Washington County, (the "Proceedings") in case No. S-444-83 in the ~~current outstanding~~ amount of no less than $1,000,000.00" [strikethrough in original].

Cash Decl., Ex. 1.

The operative paragraph is similar in the *Assignment of Claim*:

> O'brien, Gregory... ("Assignor") in consideration of the sum as agreed to in the Purchase agreement dated on the ___ day of _____ 2006 does hereby transfer to Argo Partners.. ("Assignee"), all of Assignors right, title and interest in and to the allowed and recommended claim or claims of Assignor ("the Claim"), as more specifically set forth (the "Claim") against Ambassador Insurance Company (the "Estate") in liquidation proceedings in the Superior Court of Vermont, Washington County, (the "Proceedings") case No. S-444-83 in the ~~current outstanding~~ amount of no less than $1,000,000.00" [Strikethrough and blank lines in original]

Cash Decl., Ex. 2.

---

[9] Illustrating the mechanical approach taken by Argo, the negotiated contract documents were covered by a letter nearly identical to the September 14 communication.  Both letters, like the Argo-drafted contract documents, were boilerplate. Cash Decl., Ex. 14.  The second letter told O'Brien that acceptance of the Argo offer would "bring your total recovery to 96.25%."  This figure is inconsistent with a belief that O'Brien's claim was both the $1,000,000 principal **and** interest, since if interest was included, the percentage would be much lower.  In fact, under Argo's view, O'Brien should recover $962,500.00 from a total claim of $1,516,417.90 (the $1,000,000 plus $516,417.90 in accrued interest) O'Brien's total recovery would be **only approximately 63%.**

Neither of these contract documents mentions any sale of O'Brien's "right, title and interest" in interest payments accrued on the original claim. Neither documents contains a definition of the words "allowed and recommended claim." The documents are consistent with the testimony of both O'Brien and Dachs regarding their intentions: Argo proposed and agreed with O'Brien that Argo would purchase the "allowed claim" for "6.25 cents on the dollar." Shortly thereafter, Argo paid the money due to O'Brien, $62,500. *Am'd Cplt.*, ¶ 68; Cash Decl., Ex. 15.

Soon after, Argo sought payment from the Liquidator based on its transaction with O'Brien. By letter dated December 14, 2006, De Koven, on behalf of Argo, provided the Liquidator an "original Assignment of Claim in regard to the Ambassador Claim (Claim Number Unknown), executed by Gregory O'Brien, on his own behalf, in the amount of $1,000,000.00, and by myself on behalf of Argo Partners." No mention was made of any purported assignment of anything except the balance of the original $1,000,000.00 "allowed claim." Cash Decl., Ex. 16 Argo represented to the Liquidator that it had purchased from O'Brien **both** the balance of the "allowed claim" ($100,000.) **plus** $516,417.90 (representing the accrued interest). Argo knew, or should have known, that it had **not**, in fact, purchased the right to the accrued interest by the plain and precise terms of its contract documents with O'Brien. *Am'd Cplt.* ¶ 71-72.

By notice dated October 31, 2008, the Liquidator wrote Dachs to advise O'Brien "Ambassador has already paid you 90% of the amount of your approved claim." The notice advised O'Brien of the receipt of the money due under the New Jersey jury verdict (now totaling $205 million), further advised that "[t]his recovery…, together with other assets of Ambassador, should enable the Liquidator to quickly seek Court approval to pay you the remaining **10% of your approved claim**… **[i]n addition**, the Ambassador Liquidation Order provides for the

payment of interest on your claim…[t]he Liquidator expects that there will be sufficient funds to pay interest on your claim, as provided for in the Liquidation Order." This final communication preserves the distinction between an "approved claim" and accrued interest on the underlying claim. *Am'd Cplt.* ¶ 69; Cash Decl., Ex. 17.

On November 20, 2008, the Liquidator filed an *Application for Approval of Supplemental Distributions* with the Vermont court, asking the court to approve "100% on "allowed claims," and, in a separate paragraph, "[t]o approve immediate payment of the interest due on allowed… claims, pursuant to and as calculated under the terms of Paragraph 21(d) of the Liquidation Order." Cash Decl., Ex. 5. Soon thereafter, Dachs and O'Brien discovered that Argo was seeking payment of the accrued interest. Dachs Dep. 64-65, Cash Decl., Ex. 31; O'Brien Dep. 86-89, Cash Decl., Ex. 30. By two letters dated December 9, 2008, Dachs advised the Liquidator of the situation and asked the Liquidator to pay the accrued interest to O'Brien. Alternatively, Dachs asked the Liquidator to make no interest payment at all until the matter could be resolved. Cash Decl., Ex. 18, 19.

On January 16, 2009, the Vermont court issued a formal order directing the payment of both the "allowed claims" and interest accrued:

> The Receiver is now authorized to reimburse "allowed claims falling with 8 V.S.A. § 3595(b)(4) ("Priority Four claims") at 100% of the allowed amount; and [t]he Receiver is further allowed to disburse to those claimants with allowed Priority Four claims, and who are entitled to the payment of interest under the terms of Paragraph 21(e) of the March 10, 1987 Liquidation Order, interest accruing from the first partial payment on their claims.

Cash Decl., Ex. 6.

Under cover of a letter of January 22, 2009, the Liquidator paid Argo $100,000, advising that the Liquidator was "now able to pay the unpaid 10% balance of the above numbered

14

approved claim, with interest." In that same letter the Liquidator confirmed that they were aware of the dispute, which had arisen between O'Brien and Argo, and stated that "[u]ntil this dispute is resolved, we will not pay interest to you or the assignor." Cash Decl., Ex. 20. This was confirmed to Dachs in a letter dated March 6, 2009, noting that the accrued interest had, in light of the dispute, been placed in "a court account or other suitable escrow account pending the outcome of… [the] action." Cash Decl., Ex. 21. By letter of April 30, 2009, the Liquidator advised Dachs that the accrued interest on O'Brien's claim amounted to $516,417.90. Cash Decl., Ex. 22. The instant lawsuit followed, and it is the understanding of the parties that the Liquidator will pay the funds in conformance with the outcome of this case.

## III. STANDARD OF REVIEW

This Court recently described the Fed. R. Civ. P. 56(c) standard for deciding motions for summary judgment:

> The party seeking judgment bears the burden of demonstrating that no issue of fact exists…. The party resisting summary judgment must not only show a disputed issue of fact, but it must also be a material fact in light of substantive law…. When ruling on a summary judgment motion, a court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant…. Summary judgment may not be granted where the issue turns on the credibility of witnesses. Any assessments of credibility and all choices between available inferences are matters to be left for a jury and are not, therefore, matters to be decided by the court on summary judgment.

*Breslin Realty Dev. Corp. v. Schackner*, 457 F. Supp. 2d 132, 135-136 (E.D.N.Y. 2006) (citations omitted). This standard has been applied to contract cases arising under New York law in *United States ex rel. AWL Indus. v. Site Remediation Servs. Corp.*, 92 F. Supp. 2d 132, 135-136 (E.D.N.Y. 2000) (citations omitted):[10]

---

[10] There is no dispute that New York law applies to the instant case.

15

> Where the terms of a contract are clear and unambiguous, 'and reasonable people could not disagree as to the meaning of the text, the contract's interpretation is a question of law to be answered by the court.... Where the terms of a contract are ambiguous and susceptible to more than one meaning, the court may consider evidence outside of the contract as an aid to interpret the meaning of the language that the parties chose... **The language at issue will be deemed ambiguous if it is '"capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . ."'** Where, on the other hand, contract language has a "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion" the contract is without ambiguity.

## IV. ARGUMENT

**A. The Contract was for the assignment of "all right, title and interest in and to the allowed and recommended claim," in the sum-certain amount of $1,000,000, and did not include a separate right to accrued interest.**

> Prior to the 17th century, English law would not have authorized a suit like this one. But that is because, with only limited exceptions, English courts refused to recognize assignments at all.... [citations omitted] Courts then strictly adhered to the rule that a 'chose in action'--an interest in property not immediately reducible to possession (which, over time, came to include a financial interest such as a debt, a legal claim for money, or a contractual right)-- simply 'could not be transferred to another person by the strict rules of the ancient common law.'

*Sprint Communs. Co., L.P. v. APCC Servs.*, 128 S. Ct. 2531, 2536 (U.S. 2008) (citations omitted).

The original concept of the "chose in action," derived from French jurisprudence, is based on the "chose," or "thing." The central issue in the instant case requires defining what that "thing" is. Magistrate Judge Tomlinson, ruled in her Order of December 16, 2009 that an assignment using the words "all right, title and interest" completely and totally transfers all rights in the thing transferred. She observed, "[I]t appears that much of the litigation going forward will involve Judge Wexler's final determination of exactly what rights were transferred in the

16

assignment and what constitutes the 'assigned claim' as the term appears in the relevant documents."[11] That "final determination" is a contested issue of fact for a jury to resolve, which turns on the credibility of witnesses, and choices between available inferences.

### 1. The core term of the contract, "allowed and recommended claim," is objectively ambiguous.

Where the terms of a contract are ambiguous and susceptible to more than one meaning, the court may consider evidence outside of the contract as an aid to interpret the meaning of the language that the parties chose. *United States ex rel. AWL Indus. v. Site Remediation Servs. Corp.*, 92 F. Supp. 2d 132, 135 (E.D.N.Y. 2000), *see also Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

Resolution of the issue of whether an ambiguity exists, sufficient to allow consideration of extrinsic evidence, presents a question of law for the court. *Id. See also Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 572-73, 498 N.Y.S.2d 344, 346 (1986); *Beltrone Constr. Co. v. State of New York*, 189 A.D.2d 963, 965, 592 N.Y.S.2d 832, 834 (3d Dept 1993). The language at issue will be deemed ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . ." *Site Remediation Servs. Corp.,* 92 F. Supp. 2d at 136; *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir. N.Y. 1990) ("It is only where the language and the inferences to be drawn from it are unambiguous that a district court may construe the contract as a matter of law and grant summary judgment accordingly.")

---

[11] *Civil Conference Minute Order*, December 16, 2009, at ¶¶ 2-3, Cash Decl., Ex. 27.

The only term of the contract in dispute is the meaning of the words "allowed and recommended claim," and, in the context of this motion, the threshold question for the Court is whether those words are ambiguous.  They are.

"Allowed and recommended claim" is not a commonly understood phrase, nor is it used in ordinary conversation.  It does not appear to be defined in any common dictionary.[12]  The term "allowed claim," however, is defined under New York law as "a claim which has been allowed by the court in a proceeding under article seventy-four of this chapter," and this usage is consistent with that used in the *Liquidation Order*, but that does not resolve the ambiguity at issue here.  NY Ins § 7602(g).  There are no reported cases, scholarly works or professional publications of which we are aware, or cited by Defendant, in any U.S. jurisdiction which set out a definition of the phrase as it is used in this contract.  The two contract documents in which it appears do not contain a definition, and while the *Assignment of Claim* contains the words "as more specifically set forth," there is nothing in the document that "sets forth" anything.[13]  The testimony elicited in the depositions does not provide any more definite and precise meaning.  Dachs, an experienced attorney, understood it to mean the sum-certain amount of the claim recommended to and approved by the Liquidator, and not interest which may have accrued.  Singer's testimony is internally contradictory, first opining that "What it generally means to me is that the principal amount of the claim that was allowed by the receiver as a basis for paying people," and then moments later stating that it means "all rights and interests and everything else to the claim," citing "standard procedure in our business."  In fact, there is

---

[12] *Defendant's Memorandum of Law*, at p. 11, provides the Black's Law Dictionary definition of "claim," but that does not help, as it is the words modifying the word "claim" that are at issue.
[13] A careful reading of the sentence reveals it to be grammatically nonsensical, and although it appears to promise a definition, none can be found.  This may be a product of a long-used, and rarely edited, boilerplate contract.

nothing whatsoever in the record relating to "standard procedure, apart from Singer's belated and unsupported reference." Singer Dep. 42, Cash Decl., Ex. 34. In short, without resorting to evidence outside the contract, the words are not only ambiguous, they are almost undefined.[14]

Defendant, unable to articulate an argument showing that "allowed and recommended claim" is unambiguous, advances two alternate theories. Both fail.

The first ignores the words of the contract documents, and focuses on the meaning of the word "claim." Standing alone, perhaps that word is unambiguous. But in this contract it does not stand alone, and Defendant must grapple with the words as they actually are. Any other construction would not only ignore the words of the contract, but would render the defining phrase "allowed and recommended" as meaningless, a position particularly weak given that Argo drafted the contract language. The second is founded on the assertion that the meaning of "allowed and recommended" is not really at issue at all, and all that is important is that O'Brien assigned his "entire right title and interest." But the words "all right, title and interest in and to" logically require a defined thing to describe. *See, e.g.,* N.Y. Gen. Oblig. Law § 13-109, an assignment is "the transfer of one whole interest in… [a] **thing**." (emphasis added).

*Yount v. Acuff Rose-Opryland,* 103 F.3d 830 (9th Cir. Cal. 1996), relied on by Defendant, actually illustrates this point. In *Yount,* a songwriter had entered into a contract to "… sell, assign and transfer to W. S. STEVENSON, all of my rights, title and interest in and to the song

---

[14] *See, e.g., In re United States Brass Corp.,* 277 B.R. 326, 332 (Bankr. E.D. Tex. 2002) ("It is not the burden of the Court to provide the definition or measure of a 'unit', nor may the Court infer such meaning absent further information. Analysis of the 'four corners' of the document clearly indicates that a 'unit' is not a 'claim': but there is insufficient information as to what a unit is or to indicate that the parties had a mutual understanding as to what the term 'unit' refers… Here, several alternative meanings could be inferred respecting the term 'unit' - no one meaning is more reasonable than the other.")

entitled, 'RELEASE ME.'" *Id.* at 832. The plaintiff in *Yount* tried to assert that "all" meant

something less that everything: "To overcome the plain meaning of the written contract,

however, Yount must introduce evidence that both he and Stevenson affirmatively intended to

exclude foreign royalties from the assignment - that for them 'all' meant 'less than all.' Yount

has introduced no such evidence." *Id.* at 836. The critical distinction between *Yount* and the

instant case is that in *Yount* there was no dispute over the "thing" to which the word "all"

applied: the song "Release Me." The result would have been very different if the words "the

song 'Release Me'" were themselves ambiguous.

Defendant's recitation of the contractual language calling for O'Brien to remit any

"future distribution it received from the Estate on this Claim" similarly does not resolve the

ambiguity, because the word "Claim" in the contract is, in turn, defined as "the allowed and

recommended claim or claims." The bottom line is that O'Brien certainly sold "all" of

**something** to Argo.[15] Argo wrote the contract to describe the **something**, and the words Argo

chose to use are, at best, ambiguous.[16]

---

[15] *American Home Prods. Corp. v. CAMBR Co.,* 2001 U.S. Dist. LEXIS 716 (S.D.N.Y. Jan. 29, 2001) involved an assignment, like the one at issue, of "all" right, title and interest, but unlike O'Brien's assignment, contained both an explicit list of things that were subject to word "all," and a corresponding list of exclusions. The court rejected the transferor's unsupported contention that there was an ambiguity. The difference between the two cases illustrates and vindicates O'Brien's contention: "CAMBR could have negotiated a clause that would protect its right to unforeseen, complex causes of action... [i]nstead, CAMBR excluded one specific cause of action and unambiguously conveyed all of its other stakes to litigation, known and unknown." In contrast, the agreement negotiated here was structured not by listing the things included and excluded, but by the use of a phrase describing the thing.

[16] It is not surprising, as Defendant points out, that in his Amended Complaint, O'Brien alleges that the contract documents "clearly and unambiguously refer[] only to the balance of his Allowed Claim." *Defendant's Memorandum* at p. 22. Plaintiff has consistently stated that this meaning was unambiguous **to him** (and to his lawyer). But in the context of this motion, the question is whether the words are "'capable of more than one meaning when viewed **objectively** by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Site Remediation Servs. Corp., supra.*

## 2. Because the contract terms at issue are ambiguous, the Court must look to extrinsic evidence.

The contract documents between O'Brien and Argo were negotiated within the framework and context of the Vermont liquidation proceeding. In fact, the contract documents contain explicit language to that effect, describing the subject of the transaction as the "allowed and recommended claim or claims of Assignor .... against Ambassador Insurance Company . . . in liquidation proceedings in the Superior Court of Vermont." Accordingly, it is proper to look first to determine if the Vermont court's liquidation order defined the words "allowed claim." It did, and did so in a way to distinguish it from accrued interest, and based on a defined amount of money.

Tellingly, the original offer, and all of the subsequent negotiations, center around a purchase price articulated in terms of "cents on the dollar," a method which can logically only be used effectively to set the price for an object denominated in sum-certain terms, such as O'Brien's "allowed claim." This usage, and the plain meaning which follows from it, is eventually embodied in the contractual documents, which described the thing being transferred using the same terms of art. The only thing transferred was all "right, title and interest" in the outstanding $100,000.00.

Importantly, in other circumstances, Argo has itself drafted purchase and assignment agreements making clear that the "thing" being purchased was not only an "assigned claim," but also any interest, penalties or fees which may have accrued. For instance, in at least four situations similar to the Ambassador transaction, Argo used language, which clearly and specifically modifies its usage of the word "claim" (itself broader than "allowed claim") to include interest payments: "[A]ll of assignor's right, title and interest in and to the claim or claims of Assignor, as more specifically set for ('the Claim') .... Including without limitation the

21

Proof of Claim... **and Assignors right to receive all interest, penalties and fees**, if any which may be paid with respect to the Claim."  Cash Decl., Ex. 23-26 (emphasis added).

By contrast, Argo drafted the contractual documents at issue in the instant case to limit their purchase to a sum-certain "allowed claim." The inescapable conclusion is that, when Argo intends to purchase a claim and the interest accrued on that claim, Argo knows exactly how to craft contract language reflecting that intent. Here, Argo did not do so because all it intended to purchase was O'Brien's "allowed claim."

If, as it contends, Argo meant to purchase both the sum-certain "allowed claim" and the interest, which in O'Brien's case is more than five times more valuable, one would expect to find some indication of that intention, if not in the contractual documents, than at least in Argo's internal documents setting out assessments of the value of thing they were intending to purchase or setting the amount of the bid.  In fact, Magistrate Judge Tomlinson ordered Argo to search for and identify any documents, "which discuss or mention the topic of the assignment of claims and whether or not the topic of interest is mentioned or alluded to in any document." Argo submitted a declaration stating that "no responsive documents" could be located.[17]

Argo makes much of selective quotations from the testimony of O'Brien, which obscure the full meaning of the factual dispute presented in this matter.  It is clear that O'Brien, a layman with no legal education, was concerned about the meaning of the terms "all right, title and interest," specifically the word "interest." Of course, as would be established before a jury, and as an attorney would know, the word "interest" can have two meanings in this context.  O'Brien, as made clear in his deposition testimony, wanted to be absolutely sure that he was selling only

---

[17] *Civil Conference Minute Order, op cit.* at ¶ 5; *Declaration of Kenneth A. De Koven*, Cash Decl., Ex. 28.

the balance due to him on his "allowed claim" ($100,000.), and not interest which may have accrued over two decades. He asked his attorney to give him such assurances, and, again as is clear in the testimony, received exactly that assurance. O'Brien Dep. 68, Cash Decl., Ex. 30. **O'Brien recognized that the plain words of the contract were ambiguous, and sought assurances that the contract meant what he had meant.** Moreover, in their deposition testimony, two key Argo employees indicated that "allowed claim" did not include interest.

Argo also makes much of the fact that both sides of the transaction were well aware of the large amount of the judgment against Coopers Lybrand, and that Ambassador could soon have a large (and unexpected) amount of assets. That is true. But Argo asks this Court to draw an inference from this fact that is not justified, although it is worth noting that simply by asking the Court to draw such an inference, Argo concedes the existence of a material fact at issue. That both sides of the negotiation were aware of the New Jersey verdict, but took no action to reflect its possible effect in the negotiations, the contract documents or their own independent conduct, strongly supports the conclusion that the possibility of interest payments was not relevant to the transaction. In short, whether or not interest was likely to be paid did not matter, since it was not being bought or sold. Further examination of the inferences suggested illustrates why a jury is likely to find that O'Brien's inartful layman's understanding was, in the end, correct.

Argo has advanced no testimony, nor any documents, that indicate that it assessed the value of potential future interest payments, or the probability of the payment of such amounts. Dachs and O'Brien (except for O'Brien's emphatic testimony that he understood that he was not selling any possible accrued interest payments) affirmatively assert that they made no such effort at assessing the probabilities respecting future interest payments **because they did not believe that such payments were the subject of their negotiations.**

Argo, a jury may find, made its money through the efficiencies of its business processes, including the use of form contracts, scripted telephone pitches, and "templates." Rarely, if ever, do insolvent companies pay more than what is due to its creditors, and thus, a jury may well find that Argo's streamlining of its procedures, its use of a simple "cents on the dollar" bid approach, and lack of any documentation reflecting a valuation of the interest which may have accrued, is to be expected. Usually "allowed and recommended claim" is clear enough. But where, as in this case, the unexpected happens, and the insolvent company pays out not only the "allowed claim" but interest on those claims, Argo's boilerplate contracts are (from their perspective) inadequate.[18] Argo may wish it had entered into a contract with O'Brien to purchase "all right, title and interest" in both the "allowed claim" and the interest which had accrued, but they did not. If, as Argo now implausibly asserts, it thought it was negotiating for "all rights and interest and everything else" it should have used the correct boilerplate contract with **unambiguous** language describing the transaction. But they did not, and a jury may likely conclude that Argo used the simpler boilerplate because they never thought about the possibility that interest could be paid in addition to the allowed and recommended claim, and, thus, made no effort to negotiate for its purchase, or draft and use contractual documents which included accrued interest.

**B.      O'Brien's fraud claim prevails.**

O'Brien's fraud claim has two bases, both of which are meritorious.

First, as plead in the complaint, O'Brien alleges fraud based on Argo's conduct **after** the assignment transaction was completed, and the enormity of the accrued interest became apparent, and **after** Argo realized that it had not drafted a contract transferring both O'Brien's "allowed claim" and the far more valuable accrued interest. At this point, Argo falsely represented to the

---

[18] Argo has been in the same business for 19 years.  Singer could recollect only one or two other specific instances similar to the one at issue here. Singer Dep. 9, 77-78, Cash Decl., Ex. 34.

Liquidator the nature of the agreement with O'Brien, seeking to have the interest-related funds transferred to them.[19] It is only because O'Brien learned of this effort that the Liquidator is holding the funds against this Court's decision, and has not yet given O'Brien's interest to Argo.

Defendant's legal argument correctly states the general summary of New York law with respect to fraud where the false representation is made to a third party. *See, e.g., Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. N.Y. 1998) ("...a plaintiff does not establish the reliance element of fraud for purposes [under]... New York law by showing only that a third party relied on a defendant's false statements.")  But the instant case falls into an exception to the *Lollo* rule. "[F]raud may exist where a false representation is made to a third party, resulting in injury to the plaintiff." *Ruffing v. Union Carbide Corp.*, 308 A.D.2d 526, 528 (N.Y. App. Div. 2d Dep't 2003); *see also, Buxton Mfg. Co. v. Valiant Moving & Storage*, 239 A.D.2d. 452, 454 (N.Y. App. Div. 2d Dep't 1997). "Third party reliance on fraud is also cognizable under New York law where there is a sufficient causal connection between a defendant's fraud and a plaintiff's injury." *In re Pharm. Indus. Average Wholesale Price Litig.*, 2007 U.S. Dist. LEXIS 26242, 119-120 (D. Mass. Apr. 2, 2007). *But see, City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. N.Y. 2008) (citing *Lollo* with approval); *Siotkas v. Labone, Inc.*, 594 F. Supp. 2d 259 (E.D.N.Y. 2009).  The difference between the general rule and exception is the degree to which the misrepresentation to the third party is linked to the harm caused to the Plaintiff, for *Lollo* and *Smokes-Spirits* both involve situations where the connection is relatively attenuated.  O'Brien's situation is different.  Argo falsely told the Liquidator that they had bought the whole claim (without limitation) and as a direct result, O'Brien was not paid the

---

[19] Plaintiff does not, in his *Amended Complaint* advance a cause of action based on fraudulent representations (or omissions) made to O'Brien.

money due him (and still has not been paid.)

Second, based on Argo's testimony developed in discovery and the defenses asserted by Argo, there is a strong claim that Argo misled O'Brien in its offer letter and during negotiations.[20] Argo vigorously contends that it intended to purchase both the balance and the potentially accrued interest on O'Brien's claim.   However, Argo's offer letter informs O'Brien that Argo was offering to pay a fixed amount of "cents on the dollar" for his claim, and that its offer would result in a 95% recovery for O'Brien. Argo's assertions, if accepted, require a fact finder to believe that the critical sentence of it's December 5, 2006 bid letter, "[you] have a claim in the Ambassador Insurance Company liquidation that appears to have been approved for allowance in the amount of $1,000,000.00… [and] you… should have received distributions totaling 90%... [we] are prepared to make an offer of an additional 6.25 cents on the dollar, which translates into a payment of $62,5000.00, bringing your total recover to 96.25%" was intended to entice the recipient to "simply complete and sign the attached Purchase Agreement and Assignment of Claim," without realizing that what he was actually selling was not just the remaining 10% of the "allowed claim" (at 6.25 cents on the dollar), but also selling interest accrued dating back almost three decades: in the case of O'Brien, more than $500,000.00. This is deception, nothing more.

In short, there are two versions of events which a jury could find.  The first, and most plausible, is that both sides of the transaction never considered that the Ambassador liquidation would be unusual, nearly unique, and negotiated and contracted for a sum certain "allowed claim" in much the same way has they had in the past.  The second is that Argo did consider the

---

[20] To the extent this claim is not fully plead in the *Amended Complaint*, O'Brien shall amend the complaint as requested or permitted by the Court.

possibility of the interest, and deliberately constructed its negotiations and contract documents to obscure and conceal that intention

### C. New York State's "Structured Settlement Act" Applies.

New York State's "Structured Settlement Protection Act," General Obligation Law § 5-1701, *et seq.*, was passed in part to address what was perceived as issues like the one here. "The act, similar to others nationwide, was designed 'to protect the recipients of long-term structured settlements from being victimized by companies aggressively seeking the acquisition of their rights.'" *Matter of 321 Henderson Receivables, L.P. v. Martinez*, 2006 NY Slip Op 26054, 2 (N.Y. Sup. Ct. 2006) (quoting the Assembly Memorandum in Support of the enactment). Its applicability to the instant matter is governed by its definitional section, specifically, its definition of "structured settlement": "an arrangement for periodic payment of damages for personal injuries or sickness established by settlement or judgment in resolution of a tort claim." General Obligation Law § 5-1701.

There is no question that the underlying settlement in this case involves a claim for "damages for personal injuries," nor, of course, is it contested that the arrangement was established by a "settlement or judgment." The only issue is whether the terms of the settlement agreement constitute a "periodic payment." "Periodic Payment" is also defined within the act as "include[ing] both recurring payments and scheduled future lump sum payments." *Id.* In this case, and as a result of that settlement, O'Brien in fact received a series of "recurring payments," eventually totaling $900,000.00. The settlement entered into was precisely as described in the statute: "an arrangement for periodic payments." Defendant cites not a single case standing for the contrary proposition, and it appears that the issue before the court now, one of mixed law and fact, is one of first impression.

27

**IV. Conclusion**

   For the reasons argued above, this Court should deny the Defendant's Summary

Judgment motion.


DATED:  April 19, 2010
      Washington, D.C.

          Respectfully submitted:

          Steven A. Cash, Esq.
          Harris, Cutler, Cash & Houghteling LLP
          1825 Eye Street, Suite 400
          Washington, DC 20006
          Telephone: 301.908.3927
          e-mail: scash@hcchlaw.com
          EDNY Bar Number SC7726
          DC Bar #502439


          Jonathan Harris, Esq.
          Michael Rooney, Esq.
          Harris, Cutler, Cash & Houghteling LLP
          111 Broadway, Suite 402
          New York, NY 10006
          Telephone: 212.397.3370

          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was mailed on

April 19, 2010 via Federal Express and electronically to:

        Kenneth I. Schacter, Esq.
        Bingham McCutchen LLP
        399 Park Avenue
        New York, New York 10022

        Attorney for Defendant Argo Partners, Inc.

DATED:    April 19, 2010
          Washington, D.C.

                  Respectfully submitted:

                  Steven A. Cash, Esq.
                  Harris, Cutler, Cash & Houghteling LLP
                  1825 Eye Street, Suite 400
                  Washington, DC 20006
                  Telephone: 301.908.3927
                  e-mail: scash@hcchlaw.com
                  EDNY Bar Number SC7726
                  DC Bar #502439
                  Jonathan Harris, Esq.
                  Michael Rooney, Esq.
                  Harris, Cutler, Cash & Houghteling LLP
                  111 Broadway, Suite 402
                  New York, NY 10006
                  Telephone: 212.397.3370
                  *Attorneys for Plaintiffs*

                  *Attorneys for Plaintiffs*