**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

GREGORY O'BRIEN, on behalf of himself and others
similarly situated,

Plaintiff,

v.

ARGO PARTNERS, INC., a/k/a ARGO PARTNERS,

Defendant.

09 Civ. 1020 (LDW) (AKT)

**RESPONSE TO DEFENDANT'S
STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT
OF MOTION FOR SUMMARY
JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1, Plaintiff Gregory O'Brien

("O'Brien" or "Plaintiff") respectfully submits the following response to the Argo Partners, Inc.,

("Argo" or "Defendant") Statement of Undisputed Material Facts in Support of Defendant's

Motion for Summary Judgment, dated March 18, 2010, ("Argo Fact Statement") setting forth

such material facts as to which there is a genuine issue.

Part A contains the response to the matters set forth in the Argo Fact Statement and is

keyed to the paragraph numbers used therein, pursuant to Fed. R. Civ. P. 56(e) and Local Civil

Rule 56.1(b). Text in *italics* (including <u>underlined</u> to indicate Argo's emphasis) quotes from the

Argo Fact Statement; text in **bold** sets out Plaintiff's response.

Part B contains Plaintiff's additional disputed facts that support his claims against Argo

and that warrant a trial. Evidentiary support for Plaintiff's statement of disputed facts can be

found in the exhibits and deposition transcripts attached to the accompanying Declaration of

Steven A. Cash in Opposition to Motion for Summary Judgment of Defendant Argo Partners, Inc. ("Cash Decl.").[1]

## Part A

1.      *Argo is a New York investment firm that specializes in purchasing the claims of creditors of distressed companies, including insurance companies.  Argo Answer at ¶¶ 18-19. Plaintiff Gregory O'Brien ("O'Brien") is a New York resident.  Amended Complaint at ¶ 6.*

**Not disputed for purposes of this motion.**

2.      *On July 3, 1986, O'Brien settled a medical malpractice claim he had brought against Brookhaven Memorial Hospital of New York and medical personnel at the hospital ("Brookhaven") for $1 million.  October 29, 2009 Deposition of Gregory O'Brien ("O'Brien Deposition"), attached to the Schacter Declaration as Exhibit A, at 15-24.  Amended Complaint at ¶ 42.*

**Not disputed for purposes of this motion.**

3.      *Attorney Norman Dachs ("Dachs"), and his law firm of Shayne, Dachs, Stanisci & Corner, served as O'Brien's counsel with regard to the settlement and his underlying lawsuit against Brookhaven.  September 16, 2009 Deposition of Norman H. Dachs ("Dachs Deposition"), attached to the Schacter Declaration as Exhibit B, at 13-18. Amended Complaint at ¶ 28.*

**Not disputed for purposes of this motion.**

4.      *As part of the settlement terms, O'Brien agreed that he could enforce his claim only against the hospital's insurance carrier, Ambassador Insurance Company ("Ambassador"). O'Brien Deposition at 22.  See also July 3, 1986 Stipulation of Settlement ("Settlement*

---

[1] There were five depositions taken in discovery in this matter: Plaintiff Gregory O'Brien, Attorney Norman Dachs, former Argo analyst Joseph N. Puccio, Argo employee and attorney Kenneth De Koven, and Argo President Michael Singer.

*Stipulation") (Dachs Deposition Exhibit 3) at 4, attached to the Schacter Declaration as Exhibit C.*

**Not disputed for purposes of this motion.**

5.     *At the time of the settlement, O'Brien and his counsel knew that Ambassador was in liquidation proceedings in Vermont. O'Brien Deposition at 22-23; Dachs Deposition at 17. Settlement Stipulation at 4. See also March 10, 1987 Ambassador Liquidation Order (Dachs Deposition Exhibit 17) at 4, attached to the Schacter Declaration as Exhibit D.*

**Not disputed for purposes of this motion.**

6.     *Given Ambassador's pending liquidation, the Settlement Stipulation to which O'Brien agreed specifically provided that payment to O'Brien, if any, "shall be based upon payments made to similar claimants, depending upon the funds available during the course of the liquidation." Settlement Stipulation at 5.   "No representation is being made at this time as to the amount of payment or as to the date of payment." Id. at 4 (emphasis added).*

**Not disputed for purposes of this motion.**

7.     *Accordingly, both O'Brien and his counsel knew that the terms of the settlement did not provide for or guarantee any payment, much less and [SIC] recurring, periodic or scheduled payments from Ambassador.*

> Q.     *You understood at that time that there was a chance that you might get nothing from the Ambassador Insurance Company; correct?*
>
> A      *Correct.*
>
> Q.     *And you understood at that time that there was no guarantee that there would be a set of scheduled payments made to you; correct?*
>
> A.     *Correct.*
>
> Q.     *You didn't know when Ambassador might make a payment to you; right?*
>
> A.     *Right*
>
> Q.     *You didn't know how much they might make in a payment to you; right?*

> A.      Right.

*O'Brien Deposition at 29-30. See also id. at 47 (Q: And just to go back to what we talked about earlier, you never expected certain payments to be made in a certain amount or on a certain date, correct? <u>A: Yes. That was totally an unknown.</u>) (emphasis added). See also Dachs Deposition at 17-18 (Q: But the point is that at that time, you and your firm did not know when and did not know what would be paid? <u>A: You're correct about that.</u>) (emphasis added).*

**Disputed: Plaintiff contends that, while the settlement does not provide a guarantee, the settlement does require Ambassador to begin "making payments at the end of the Liquidation proceedings." Plaintiff's contention is supported, *inter alia*, by the text of the Stipulation of Settlement and the sworn deposition testimony of Mr. O'Brien's attorney, Norman Dachs. *Stipulation of Settlement* p. 4, Cash Decl., Ex. 7:**

> **A.     It was settled at trial.**
>
> **Q.     At trial. Do you know for how much?**
>
> **A.     The total settlement was – I believe it was something like 700 – don't hold me to the exact numbers, but it was something like $750,000 from the automobile, and because the Brookhaven Hospital was insolvent at the time, and its insurance company, Ambassador Insurance Company, was also insolvent, we settled on the basis of a stipulation that Ambassador would pay a million dollars. My recollection is that they called it script of a million dollars. They would pay a million dollars if and when funds became available to pay that money from the liquidation proceedings.**

**Dachs Dep. 14, Cash Decl., Ex. 31; *see also Amended Complaint* ¶ 42.**

8.      *On October 30, 1987, O'Brien (through Dachs as his counsel) submitted a claim for $1 million in the liquidation proceedings. See O'Brien Claim Form (Dachs Deposition Exhibit 4), attached to the Schacter Declaration as Exhibit E.[2] Amended Complaint at ¶ 47.*

---

[2] Dachs testified that he has extensive experience dealing with and participating in insurance company liquidation proceedings. Dachs Dep. 23-24, Cash Decl., Ex. 31.

Not disputed for purposes of this motion; however, the definition of the word "claim," as well as "allowed claim," "recommended claim" and "approved claim" are, and remain in dispute. The meaning of these terms as understood and used by the parties to the contract determines, in turn, the scope and nature of the thing transferred by the contract. Because, as in this case, the meaning of these words cannot be determined through examination of the contractual documents (except in favor of Plaintiff), and the deposition testimony regarding the meaning understood by the parties is in conflict, there is a genuine issue of fact that requires resolution by a jury, *see infra*.

9.      *O'Brien eventually collected $900,000 of his $1 million claim in five sporadic payments from Ambassador, with the last payment occurring at the end of 1999. Amended Complaint at 50-51.*

**Disputed in part:** O'Brien contends, and will prove at trial, that he collected **$900,000.00 of the "allowed claim" as approved by the Vermont Superior Court and deemed by that court to "constitute allowed claims."** *Liquidation Order* ¶ 20(e), Cash Decl., Ex. 3. *See also Amended Complaint* ¶ 48-51; *Notice of Approval of Claim*, Cash Decl., Ex. 9 **("Your claim has been reviewed and will be recommended to the Court for approval as filed in the amount of $1,000,000.**00 …."); *Claim Payments and Checks*, Cash Decl., Ex. 10.

10.     *Each time, the Ambassador Liquidator ("Liquidator") sent O'Brien a letter (through O'Brien's attorney, Dachs) stating that "there may or may not be a future distribution" depending on the assets of the estate. See id. After the last payment in 1999, Dachs would occasionally send correspondence to the Liquidator on O'Brien's behalf, inquiring as to whether additional payments may be made. See Dachs Deposition Exhibits 5-9, attached to the Schacter Declaration as Exhibits F-J. In each response, the Liquidator stated that that he did not "know the timing or amount" of distributions, if any. See id. Indeed, in 2002, the Liquidator informed Dachs that "[we are not currently authorized to issue a future distribution of Ambassador claims. Moreover, we are not aware that a distribution will be commanded in the future." Dachs Deposition Exhibit 8. See Dachs Deposition Exhibit 9. ("At this time, it is uncertain as to*

*whether or not there will be a future distribution. No decision is anticipated in the near future.").  See also Dachs Deposition at 27-28.*

**Disputed in part:** Notices sent to O'Brien were consistent with the usage of the *Liquidation Order's* definition of "allowed claim." The quotation cited by Defendant above is incomplete, and its meaning is a contested material fact. The critical omitted text reads: "WE ARE PLEASED TO ENCLOSE A CHECK OF ... [AMOUNT], WHICH REPRESENTS THE COURT APPROVED DISTRIBUTION OF... [X]% OF YOUR <u>ALLOWED</u> CLAIM OF $1,000,000.00." Cash Decl., Ex. 10 (emphasis added).

11.    *At the end of August 2006, however, the Liquidator responded to one of Dachs' inquiries by informing him that Ambassador had recently won a jury verdict in federal court in New Jersey of more that $180 million against Ambassador's former auditors, PricewaterhouseCoopers (the "Verdict"). See Dachs Deposition Exhibit 11, attached to the Schacter Declaration as Exhibit K.  The Liquidator attached press clippings regarding the award to his letter.  Id.  He also informed Dachs that the auditors had filed an appeal and therefore advised that "we cannot predict when future distributions would be processed."  See id.  See also Dachs Deposition at 33.*

**Not disputed for purposes of this motion.**

12.    *On or about September 15, 2006, Argo sent O'Brien (care of Dachs) a letter offering to purchase his claim against Ambassador for $50,000.  Dachs Deposition Exhibit 10, attached to the Schacter Declaration as Exhibit L.*

**Disputed:** On September 14 (not 15), 2006, Joseph N. Puccio, an Argo employee, sent a letter reading, in relevant part:

> A review of the records... indicated that you... [have] a claim in the Ambassador Insurance Company liquidation that appears to have been approved for allowance in the amount of $1,000,000.00. Since the liquidation, you... should have received distributions totaling 90%... We are currently bidding on the <u>allowed claims</u> and are prepared to offer an additional 5

cents on the dollar, which translates into a payment of
$50,000.00, bring your total recover to 95%.

*Letter from Joseph Puccio for Argo Partners to Gregory O'Brien*, Cash Decl., Ex. 13
(emphasis added).

O'Brien contends that this letter, which offered to purchase the remaining balance on his
"allowed claim" at a price of "5 cents on the dollar," was limited on its face to $100,000.00,
the amount of that balance. This letter did not offer to buy any amount of possible interest
which accrued on his "allowed claim," as O'Brien testified in his deposition:

> A.   He [Dachs] said there was a separate private corporation that buys out
> claims against insurance companies that are in distress, and they were
> offering me 50 cents on the dollar for my final hundred thousand.
>
> Q.   Is that how Mr. Dachs characterized it, 50 cents on the dollar?
>
> A.   Yes.

O'Brien Dep. 53, Cash Decl., Ex. 30. Dachs' testimony mirrored O'Brien's:

> A.   In other words, he was being asked -- offered 50 percent of his
> $100,000 balance and he said that he didn't feel he should give up
> half of his claim.
>
> Q.   Did you discuss with him the prospects of future recovery from
> Ambassador?
>
> A.   Well, we discussed generally that, of course, there could be full
> recovery, there could be a hundred percent recovery of the hundred
> thousand dollars, and basically the decision was up to him as to whether
> he wanted to get the money now or wait until the rest of the hundred
> thousand dollars would be paid by Ambassador.

Dachs Dep. 32-33, Cash Decl., Ex. 31.

This is a material issue on which there is a genuine issue in dispute. Because the
critical terms in the document are ambiguous, and there is no agreement on the meaning
intended by the contracting parties to apply to those words, witness testimony is required

7

to ascertain the parties' objective intent, and thus a jury trial is necessary to weigh the
credibility of the witnesses. *See Amended Complaint ¶¶ 55-57.*

13.     *O'Brien rejected Argo's initial offer, saying that it was "not enough money on the*
*dollar" nor a "fair amount." O'Brien Deposition at 55. He instructed his attorney, Dachs, "to*
*renegotiate" for a higher amount. Id. at 56.*

**Not disputed for purposes of this motion.**

14.     *During the course of negotiations with Argo, O'Brien and Dachs were well aware*
*of, and discussed, the Verdict. O'Brien Deposition at 58; Dachs Deposition at 33-35. In fact,*
*after receiving Argo's initial offer, Dachs wrote to the Liquidator requesting more information*
*on the Verdict and regarding the auditors' appeal to the Third Circuit. Dachs Deposition*
*Exhibits 12-13, attached to the Schacter Declaration as Exhibits M-N. Dachs also requested and*
*received from Argo a copy of the district court decision upholding the Verdict and denying the*
*auditors' post-trial motion for a new trial. Dachs Deposition Exhibit 14, attached to the*
*Schacter Declaration as Exhibit O. See also October 13, 2009 deposition of Joseph Puccio*
*("Puccio Deposition") at 86-7, attached to the Schacter Declaration as Exhibit P. Dachs and*
*O'Brien specifically discussed the Verdict, the pending appeal, and the impact both could have*
*on Ambassador's ability to make future payments to O'Brien. O'Brien Deposition at 58; Dachs*
*Deposition at 47-49. See also Dachs Deposition at 42 ("I advised him generally that cases do*
*get reversed and appellants are successful in many cases and that that's a chance he's going to*
*have to take."). [Footnote omitted]*

**Not disputed for purposes of this motion. However it is important to note the full**
**context of the quotation attributed to Dachs, which more completely is:**

Q.     **And just to clarify the math, when you say 62 and a half percent,**
       **please correct me if I'm wrong, you're referring to 62 and a half**
       **percent of the remaining $100,000?**

A.  62 and a half percent of the allowed claim, which was in the amount of a million dollars, of which the balance was now a hundred thousand dollars.

Q.  So it wasn't 62 and a half percent of the million dollars, because that would be $625,000?

A.  Of course not.  It was of the balance of the allowed claim.

Q.  Did you advise Mr. O'Brien as to what you thought the chances were of success or failure on appeal of that underlying jury verdict?

A.  Not in precise terms.  I advised him generally that cases do get reversed and appellants are successful in many cases and that that's the chance he's going to have to take.

Dachs Dep. 41-42, Cash Decl., Ex. 31.

15.  *In December 2006, after further negotiations with Argo (Puccio Deposition at 88-90), O'Brien, with the advice and counsel of Dachs, agreed to assign his claim to Argo for $62,500.  O'Brien Deposition at 63.  Dachs Deposition at 48.*

Disputed:  O'Brien contends that the further negotiations, which were conducted largely with Argo employee Kenneth De Koven, an attorney, were, like the original offer letter, confined to negotiating the purchase price of the "allowed and recommended" claim as defined in the *Liquidation Order*.  O'Brien maintains that he assigned only his "allowed and recommended claim," and not simply "the claim." *Amended Complaint* ¶¶ 59-65.

Dachs' testimony is clear on this point:

Q.  -- as I understand it, but correct me if I'm wrong, Mr. O'Brien's position and a position I assume you agree with is that this Purchase Agreement does not encompass interest on the claim?

A.  Absolutely.

Q.  Why do you say that?

A.  Well, I say it because, first of all, by its terms it does not include interest, it speaks only of the allowed and recommended claim.  The

allowed and recommended claim, as you'll note from the claim, is the $1 million that was allowed and recommended, so it doesn't speak of interest, and I would never contemplate that ARGO would think that it was entitled to interest on any money that was due on the $900,000 that had already been paid and that it would never contemplate interest where the terms of the agreement do not contemplate interest, and I don't think anybody had in their minds that there would be interest paid.  So for all of those reasons, I don't think that this document contemplates that there would be interest paid or that ARGO would be entitled to that interest.

Dachs Dep. 57-58, Cash Decl., Ex. 31.

O'Brien's understanding, as evidenced by his testimony, is similar:

Q.   When you received it [the purchase agreement] in the mail, did you call Mr. Dachs?

A.   Yes.

Q.   What did you discuss with him?

A.   I asked him why it said "interest" on it.

Q.   Where are you referring?

A.   The top paragraph, I believe, fourth line down, top paragraph.

Q.   Where it says "all of Assignor's right, title and interest in and to the allowed and recommended claim..."?

A.   That's in the third, yes.

Q.   Is that what you are referring to when you say interest?

A.   Yes, sir.

Q.   What did you ask Mr. Dachs?

A.   If there was interest involved.

Q.   And what did he say?

A.   He said that it doesn't mean that kind of interest.

Q.   So you were specifically asking him about interest on -- interest that you might receive?

A.   Yes.

Q.   Why did you ask him about that?

A.   Because it says it in there.

Q.   And he explained to you that interest doesn't mean that kind of interest?

A.   Right.

Q.   Is that the extent of the conversation?

A.   No. He said there was $100,000 involved and that's all it involved.

Q.   So did you talk about the possibility that you might also receive interest?

A.   He told me there was no interest involved.

Q.   So he told you the only thing involved in this assignment was $100,000?

A.   Yes, sir.

Q.   And you specifically asked him if there was interest involved and he said no?

A.   Right.

O'Brien Dep. 68, Cash Decl., Ex. 30.

But O'Brien and Dachs are not the only source of direct evidence on the meaning of the words "allowed claim" as used in Argo's boilerplate contract documents. Michael Singer, Argo's President, who said that he is "the principal manager of everything at Argo," was asked at his deposition what those words mean. Singer Dep. 14, Cash Decl., Ex. 33. He answered candidly:

Q.   You used the term '"allowed claim"' before. What did you mean by that?

A.   What it generally means to me is that the principal amount of the claim that was allowed by the receiver as a basis for paying people.

11

Q.     So in this particular case, back in '94 you determined to bid some amount for the "allowed claim", which described as the principal amount that the receiver had determined to allow to each claimant, is that correct?

A.     I'm not sure I got all the elements of your question.  But it has been the same all the way along.

Q.     The "allowed claim" is the principal amount?

A.     Correct.

Q.     And you bid some amount in order to purchase that from people?

A.     Correct.

Q.     And how is that bid expressed?

A.     As a percentage of the amount?

Q.     Can you describe how you communicate that bid to a potential seller of the "allowed claim"?

A.     Well, typically if they have a claim of 100, that's the principal amount of their claim, on which everything else is based, we will say to them you have already received, in this case, for example, let's say 75 cents on the dollar.  We are prepared to pay you another 5 cents or 7 cents or 8 cents on the amount of your claim.[3]

Singer Dep. 40-41, Cash Decl., Ex. 34.

Puccio, who initiated the contact with O'Brien via the September 14, 2006 letter, *supra*, testified similarly, describing how he understood the bid to be made to O'Brien was formulated:

Q.     When you determined the original bid that you discussed, the 5.00, does that bid incorporate your evaluation of the probability that Mr. O'Brien would be paid the balance of his allowed claim?

---

[3] Later in the same deposition, perhaps, a Jury could infer, recognizing the import of his testimony, Singer backtracked: "In return for that, we would get the claim and all rights and interests and everything else to the claim. This is real standard procedure in our business, not just insurance companies.... standard procedure." Singer Dep. 42, Cash Decl., Ex. 34.

A.   I did not compute the 5 percent bid.

Q.   Who did?

A.   Ken [Kenneth De Koven] and Mike [Michael Singer].

Q.   Did you provide any information to them which they relied upon to come up with that bid?

A.   Not to my knowledge.

Q.   The 5.00 as a percentage reflects a percentage of the balance of the allowed claim, correct?

A.   Of the entire amount of the allowed claim.

Q.   Does it reflect a percentage of what you described as the interest factor?

     MR. SCHACTER:  Objection to form.  You may answer.

A.   It is a percentage of the amount of the allowed claim.  Interest has no relevance to it.

Puccio Dep. 109-110, Cash Decl., Ex. 32.

The overwhelming inference to be drawn from the testimony, by both Plaintiff and Defendant, is that neither party believed the negotiations involved interest, and those negotiations were confined to the balance due on the "allowed claim." This inference is consistent with the absolute absence of any evidence, documentary or otherwise, that any party made the slightest effort to assess the present value of the interest accrued on the underlying claim: "I and other employees of Argo reviewed Argo's records for any documents which discuss or mention the topic of the payment of interest (specifically or generally) with respect to claims that were assigned to Argo in the Ambassador Insurance Company ("Ambassador") liquidations proceedings pending in Vermont. Upon this review of Argo's records, we located no responsive documents." Declaration of Kenneth De Koven, Cash Decl., Ex. 28.

13

16.     *In sworn interrogatory responses, O'Brien explained that, at the time of his decision:*

> *I believed that $62,500 would be the highest amount recoverable at that time because I did not believe that ARGO would pay more than that amount considering the speculative nature of the possibility that the Liquidator would even pay the remaining 10%, i.e. $100,000 in full or as to when such payment would finally be made.*

*O'Brien Interrogatory Responses dated July 9, 2009 ("Interrogatory Responses") at 3, attached to the Schacter Declaration as Exhibit Q.*

**Not disputed for purposes of this motion.**

17.     *Argo and O'Brien executed two documents to memorialize the transaction – a purchase agreement and an assignment (respectively, the "Purchase Agreement" and the "Assignment" and collectively, the "Assignment Agreements"). Dachs Deposition Exhibit 16, attached to the Schacter Declaration as Exhibit R.*

**Not disputed for purposes of this motion.**

18.     *Dachs reviewed and approved the Assignment Agreements and then sent them to O'Brien for execution. O'Brien Deposition at 65-66; 74-76. O'Brien read both documents, discussed them with Dachs, and then signed and initialed them at his home in New York. Id.*

**Not disputed for purposes of this motion.**

19.     *Both the Purchase Agreement and Assignment explicitly state that O'Brien (the "Assignor") assigned to Argo (the "Assignee") "<u>all of Assignor's right title and interest</u> in and to the allowed and recommended claim or claims of Assignor (the "Claim")" against Ambassador. See id (emphasis added).*

**Not disputed for purposes of this motion.**

20.     *The Purchase Agreement further provided that "Assignor [O'Brien] represents and warrants that the amount of the Claim is allowed <u>at not less than $1,000,000.00</u> and that the Claim in that amount is valid" and, critically, that "<u>Assignor agrees to remit to Assignee any future distribution it receives from the Estate on this Claim</u>." See id. (emphasis added).*

14

Not disputed for purposes of this motion, with the caveat that Plaintiff notes the word "claim" quoted here must be understood in the full context of the Purchase Agreement and Assignment of Claim wherein "Claim" was defined as the "the allowed and recommended claim or claims of the Assignor." *Purchase Agreement*, Cash Decl., Ex. 1; *Assignment of Claim*, Cash Decl., Ex. 2.

21.     *At his deposition, O'Brien conceded that the interest payment at issue in this case is, in fact, a "future distribution" on the claim.*

Q.      *Turning back to the Purchase Agreement, and that line regarding, where "Assignor agrees to remit to Assignee any future distribution it receives from the Estate on this Claim."*

A       *Okay.*

Q.      *The interest payment that is at issue in this case is a future distribution on your claim; correct?*

A.      *The interest?*

Q.      *Yes.*

A.      *Yes.*

*O'Brien Deposition at 81-82 (emphasis added).*

Disputed. As noted earlier, O'Brien has provided evidence, in both documentary and oral form, that it was his understanding, as well as the understanding of his attorney, Dachs, that the words "the Claim" (capitalized) in the *Purchase Agreement* and *Assignment Agreement* are defined as the "allowed and recommended claim," and that these were defined and understood to mean only the balance due on the "Allowed Claim," and did not include the possibility of interest. Plaintiff's Response, *supra* Argo Fact Statement #15. Further, O'Brien asserts that the testimony of Argo President Singer defining "allowed claim" as the "principal" amount of a claim is consistent with that definition and

15

understanding, and that later testimony, which essentially recants that statement, should and will be rejected as incredible by a jury. *Id.* Finally, the evidence, including the sworn submission of Kenneth De Koven, *Id.,* that there was no evidence of any effort by Argo employees to analyze the present value of interest associated with the claim supports a strong inference that Argo never considered the possibility that they were buying anything except the sum-certain balance of O'Brien's allowed claim. In the alternative, Argo was aware of that possibility, intended to purchase the future possibility of interest payments, and deliberately concealed that intention from O'Brien or his attorney. In either case, this central fact in this dispute is hotly contested, and very much in dispute.

22. *The Assignment additionally provided that:*

> *Assignor represents that it has adequate information concerning the business and financial condition of the Estate and the status of the Proceedings to make an informed decision regarding the sale of the Claim and that it has independently and without reliance on Assignee, and based on such information as Assignor has deemed appropriate (including information available from the files of the Court in the Proceedings), made its own analysis and decision to enter into this Assignment of Claim.*

**Not disputed for purposes of this motion.**

23. *When Argo purchased O'Brien's claim, it took the risk that little or no further distributions would be paid on the claim, whether principal or interest. October 14, 2009 Deposition of Michael Singer at 17, attached to the Schacter Declaration as Exhibit S at 55, 61, 64-65, 81. See also id. at 42 (testimony that, in return for payment, Argo received and intended to receive an assignment of "the claim and all rights and interests and everything else to the claim."). O'Brien, as noted, did not want to take that risk. See ¶ 16 above. See also O'Brien Interrogatory Responses at 4 ("In as much as I was uncertain as to whether the Liquidator had accumulated sufficient funds even to pay the principal sum due in full, I had no reason to believe that he would have sufficient funds to pay interest as well.").*

**Disputed: O'Brien contends that Argo, by purchasing only the "allowed and recommended claim," took only the risk that the remaining "Balance of [O'Brien's]**

Approved Claim with Ambassador Insurance Company" would not be paid, and took no risk with respect to the possible interest due on the original claim, because they had limited their purchase to the "approved claim." This is a material issue on which there is a genuine issue in dispute that requires a finding of fact, based on testimony and evidence before a jury.

24.    *Argo provided a copy of the executed Assignment Agreements to the Liquidator, who, after receiving them, sent Argo a letter acknowledging that the O'Brien claim "has been transferred to Argo Partners." See Dachs Deposition Exhibit 21, attached to the Schacter Declaration as Exhibit T. As in prior correspondence with Dachs, however, the Liquidator also advised Argo that "[w]e are not currently authorized to issue a future distribution of Ambassador claims. Moreover, we are not aware that a distribution will be commanded in the future." Id.*

**Disputed:  O'Brien contends that the letter sent by the Liquidator to Argo does not state that "the O'Brien claim has been transferred to Argo Partners," rather it correctly reads, "The Assignment of Claim has been transferred to Argo Partners."  Further, O'Brien maintains that by representing the "Assignment of Claim" to cover more than was negotiated, Argo intended, and caused, the Liquidator to erroneously believe that O'Brien had sold more than he had, in fact, contracted to sell.  Letter from Isabelle to De Koven (Jan. 3, 2007), Cash Decl., Ex. 29.**

25.    *The Third Circuit affirmed the Verdict on September 9, 2008. See Thabault v. Chait et al, 541 F.3d 512 (3d Cir. 2008).*

**Not disputed for purposes of this motion.**

26.    *On October 31, 2008, Ambassador announced that it had sufficient funds to pay certain claims, with interest, including the O'Brien claim assigned to and owned by Argo.*

**Disputed: The October 31, 2009, announcement, entitled "Payment of Balance of Your Approved Claim with Ambassador Insurance Company, In Liquidation" actually**

17

states that it has sufficient funds "to pay… the remaining 10% of your <u>approved claim</u>."
Notice, Payment of Balance on Your Approved Claim, Cash Decl., Ex. 17 (emphasis
added). In the following sentence, the announcement states, "In addition, the Ambassador
Liquidation Order provides for the payment of interest on your claim… [t]he Liquidator
expects that there will be sufficient funds to pay interest on your claim, as provided in the
Liquidation Order." *Id.* The distinction between "Allowed Claim" (a sum-certain) and the
"claim" (an uncertain amount which could include interest) is clear in the announcement,
consistent with the understanding of the parties to the contract, and the contract
documents, and will be proved at trial.

27.      *More than two years after assigning his claim to Argo, and having learned that
the risk associated with the appeal of the auditor litigation had been resolved and Ambassador
claimants were now entitled to more money, O'Brien instructed Dachs to "get on the case" and
"get that money." O'Brien Deposition at 91; 93.*

**Disputed in part:  O'Brien contends, as he testified at his deposition and would
testify at trial, that his instructions to his attorney were based on his knowledge that Argo
had not purchased any right to accrued interest, but only the balance of the "allowed
claim." *Supra.* O'Brien did not transfer his "claim;" rather, he transferred his "allowed
and recommended claim."**

28.      *O'Brien, with Dachs as his counsel, eventually filed this purported class action
against Argo in New York state court. See Docket No. 1 (February 4, 2009 Complaint). The gist
of the suit is that, while O'Brien does not dispute that he assigned and sold his claim to Argo,
and that Argo is entitled to the undistributed <u>principal</u> amount of his allowed liquidation claim
(i.e., $100,000), he asserts that when he sold "all right, title and interest" in his claim, he
somehow retained the right to receive distributions of **interest**. See id. at ¶¶ 31-33. The interest
on the claim is expected to be several hundred thousand dollars. Amended Complaint at 75.*

**Disputed in part:** The "statement of fact" advanced in this paragraph is a legal argument, and as a description of the "gist" of the factual and legal disputes at issue, is not properly advanced as an "undisputed fact" pursuant to Fed. R. Civ. P. 56. To the extent it can be assessed as factual statement, it is contested: O'Brien did not sell his "claim," rather, as more fully described above, he sold his "allowed and recommended claim." See *supra.*

29.     *Following removal of the case to this Court, O'Brien replaced his original litigation counsel, Mr. Dachs (who advised him with respect to his assignment to Argo), and his new counsel filed an amended complaint in September 2009. See Docket No. 19. Argo filed its answer on October 29, 2009. Docket No. 22.*

**Not disputed for purposes of this motion.**

30.     *The case was assigned to Magistrate Judge Tomlinson for purposes of discovery; the discovery schedule that Magistrate Judge Tomlinson approved provided that the parties would first conduct discovery (which is now complete) and submit dispositive motions regarding O'Brien's individual claims before proceeding with class issues. Docket No. 10.*

**Not disputed for purposes of this motion.**

31.     *At the close of fact discovery, O'Brien made a motion to compel Argo to produce additional documents "relating to [Argo's] 'state of mind' with regard to what it believed it was purchasing from the Ambassador...." See Order dated December 16, 2009, Docket No. 26. These documents consisted of assignment agreements between Argo and other Ambassador claimants. Id. Magistrate Judge Tomlinson issued an order denying O'Brien's motion. Id. The Court also denied O'Brien's request for documents related to a different proceeding between Argo and another claimant and other documents from the Vermont liquidation proceedings as "clearly outside the scope" of the proper discovery. Id.*

**Disputed in part:** To the extent defendant's statement of fact characterizes the finding of Magistrate Judge Tomlinson, the Magistrate Judge's Order is self-explanatory. *Civil Conference Minute Order*, Docket No. 26, Dec. 16, 2009, Cash Decl., Ex. 27.

32.     *Magistrate Tomlinson did, however, require Argo to search its records for any documents which discuss or mention the topic of the payment of interest (specifically or generally) with respect to claims that were assigned to Argo in the Ambassador liquidation proceedings. Id.*

**Not disputed.**

33.     *Argo located no such responsive documents and, consistent with Magistrate Judge Tomlinson's instructions, provided O'Brien with a declaration to that effect. See Declaration of Kenneth A. De Koven attached to the Schacter Declaration as Exhibit U.*

**Not disputed to the extent the statement is restricted to the fact that a declaration to the effect that no documents were located which "discuss or mention the topic of the payment of interest (specifically or generally) with respect to claims that were assigned to Argo..." However, to the extent that Argo maintains that it (through its employees) intended to acquire through assignments from O'Brien (and others similarly situated) future interest payments in addition to sum-certain allowed claims, Plaintiff disputes the assertion that "no such documents exist," as a reasonable jury could, and would, find that the absence of any documentary evidence of analysis, calculation, prediction or assessment of future interest is incredible on its face, and should be rejected. See *supra*.**

### Part B

1.     Plaintiff asserts that he intended to assign only the principal balance due to him on his "allowed and recommended claim," which constituted all of that allowed and recommended claim.

**Defendant disputes that fact.**

2.     Plaintiff asserts that Argo intended to purchase only the principal balance due to him on his "allowed and recommended claim," which constituted all of that allowed and

recommended claim.

**Defendant disputes that fact.**

3.  Plaintiff asserts that the term "allowed and recommended claim" as used in this contract is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.

**It is not known whether Defendant disputes this fact.**

4.  Plaintiff asserts that Argo falsely and fraudulently represented to the Liquidator that it had purchased from O'Brien both the balance of the Allowed Claim and the accrued interest on the entire claim, dating back to 1986.  Argo knew that they had not, in fact, purchased the right to the accrued interest, and sought to deceive the Liquidator, intending that the

21

5.      Liquidator, relying on that false representation, would pay to Argo the interest

belonging to O'Brien. *Amended Complaint* ¶ 72.

**Defendant disputes this fact.**

DATED:        April 19, 2010
              Washington, D.C.

                           Respectfully submitted:


                           Steven A. Cash, Esq.
                           Harris, Cutler, Cash & Houghteling LLP
                           1825 Eye Street, Suite 400
                           Washington, DC 20006
                           Telephone: 301.908.3927
                           e-mail: scash@hcchlaw.com
                           EDNY Bar Number SC7726
                           DC Bar #502439

                           Jonathan Harris, Esq.
                           Michael Rooney, Esq.
                           Harris, Cutler, Cash & Houghteling LLP
                           111 Broadway, Suite 402
                           New York, NY 10006
                           Telephone: 212.397.3370

                           *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was mailed on

April 19, 2010 via Federal Express and electronically to:

        Kenneth I. Schacter, Esq.
        Bingham McCutchen LLP
        399 Park Avenue
        New York, New York 10022

        Attorney for Defendant Argo Partners, Inc.

DATED:      April 19, 2010
           Washington, D.C.

        Respectfully submitted:

        Steven A. Cash, Esq.
        Harris, Cutler, Cash & Houghteling LLP
        1825 Eye Street, Suite 400
        Washington, DC 20006
        Telephone: 301.908.3927
        e-mail: scash@hcchlaw.com
        EDNY Bar Number SC7726
        DC Bar #502439
        Jonathan Harris, Esq.
        Michael Rooney, Esq.
        Harris, Cutler, Cash & Houghteling LLP
        111 Broadway, Suite 402
        New York, NY 10006
        Telephone: 212.397.3370
        *Attorneys for Plaintiffs*

        *Attorneys for Plaintiffs*